490 So.2d 396 (1986)
STATE of Louisiana
v.
Jewel SCOTT.
No. 85-KA-619.
Court of Appeal of Louisiana, Fifth Circuit.
June 2, 1986.
*397 Gregory C. Champagne, Asst. Dist. Atty., Twenty-Ninth Judicial Dist., Hahnville, for plaintiff-appellee.
Emile R. St. Pierre, Destrehan and Manina Dubroca, Kenner, for defendant-appellant.
Before KLIEBERT, GAUDIN and DUFRESNE, JJ.
GAUDIN, Judge.
Following a three-day trial in the 29th Judicial District Court, Jewel Scott was convicted of second degree murder and two counts of attempted second degree murder. He was sentenced to life imprisonment for the second degree murder and to 50 years on each of the other counts, with all sentences to run concurrently. The trial was held on June 24, 25 and 26, 1985.
Scott assigns on appeal eight district court errors and he asks this Court to search for errors patent on the face of the record. He contends that the district judge erred:
*398 (1) In denying defendant's motion for fees with which to hire a ballistics expert and an investigator;
(2) In allowing the State to amend the indictment after the jury had been sworn;
(3) In permitting the prosecution to substitute an amended bill of information for the indictment;
(4) In not granting a motion to suppress Scott's taped statement to police officers;
(5) In not suppressing the photographic lineup;
(6) In giving erroneous instructions to the jury;
(7) In not reading four special charges suggested by the defendant; and
(8) In not granting a mistrial when a prosecution witness, Robert Davis, called Scott a "drug dealer."
We find no reversible error in any of these assignments and there are no errors patent. Scott's convictions and sentences are affirmed.

BACKGROUND
Alvin Collins, a resident of Tennessee, was in Louisiana on November 6, 1983, when he, his father, Eddie Collins, and Robert Lee Davis met with Scott to arrange for the purchase of 50 pounds of marijuana.
On November 7, 1983, Alvin and Eddie Collins and Davis met Scott at a lounge where he told them to follow him to where the marijuana was located. Scott stopped once and made a phone call and told them that the deal was arranged and to continue following him.
They proceeded down Highway 90 where Scott stopped his truck several times because he said he was having engine trouble. At some point a car began to follow them. Because the highway was too public for the deal, they turned down a dirt road.
Once the vehicles had stopped, Alvin Collins and Davis left their automobile. Almost immediately, Scott and the two men in the car following began firing upon Alvin and Eddie Collins and Davis. Alvin Collins and Davis ran into the sugar cane fields, but not before Alvin Collins was shot in the shoulder and thumb. Eddie Collins was shot several times in the upper torso and died from the gun shot wounds.
Alvin Collins and Davis said that Scott had a pistol and that the other two men had rifles. The bullet taken from Eddie Collins was of the .38 caliber family, but it was too damaged to be more specifically identified.
Scott testified that he had set up the drug transaction but that that was his only involvement. He testified that he got out of his truck on the dirt road with a chrome-plated timing light so he could fix his truck. Once the shooting started, he ran into the woods because he had approximately $8,000.00 cash in his pocket and feared for his safety. He stated that when the shooting stopped, he fled the scene.

ASSIGNMENT NO. 1
Scott, an indigent defendant, sought funds to hire a ballistics expert and an investigator, which requests were denied by the trial judge. Appellant cites State v. Johnson, 333 So.2d 223 (La.1976); State v. Phillips, 343 So.2d 1047 (La.1977); and Barnard v. Henderson, 514 F.2d 744 (5 Cir.1975).
Ballistics experts are not supplied in every case. Here, the trial judge, in denying the request, said:
"I do not feel that under the circumstances... an expert could help you in any fashion. The State obviously is relying upon the testimony of witnesses. The ballistics gathered do not tell anything in this case, particularly since there are no weapons to tie the bullets into. So I don't see how a ballistics expert could help you."
No weapons were recovered by police officers either at the scene or later. Only one bulletthe .38 caliber bullet taken from Eddie Collinswas recovered, and it had no meaning as there were no weapons to possibly relate it to.
With regard to the services of an investigator, the district judge, pointing out that *399 two attorneys had been appointed to represent Scott, stated:
"... that's what the court appointed you and Mr. St. Pierre for. You be the investigators..."
(Underlining provided.)
Other than in general terms, Scott has demonstrated no prejudice because of a lack of an investigator.
In State v. Madison, 345 So.2d 485 (La. 1977), the Supreme Court of Louisiana, at page 490, said:
"The right to a private investigator may in many cases be an adjunct to the right to counsel: furnishing counsel to the indigent defendant is not enough if counsel cannot secure information on which to construct a defense ... It is a fundamental principle that the kind of trial a man gets cannot be made to depend on the amount of money he has. Griffin v. Illinois, 351 U.S. 12, 76 S.Ct. 585, 100 L.Ed. 891 (1956). Therefore when an indigent defendant shows that his attorney is unable to obtain existing evidence crucial to the defense, the means to obtain it should be provided for him, and if the indigent defender system cannot defray the expense, the State ought to supply the funds."
In Madison, the defendant did not make a sufficient showing for the appointment of an investigator, nor did Scott in the instant case. A defendant must show that he is unable to obtain evidence crucial to the defense, as stated in State v. Monroe, 397 So.2d 1258 (La.1981), and that an investigator could (or at least might) obtain the evidence sought. The burden is on a defendant to make the required showing.
The trial judge here did not err in not providing funds for either a ballistics expert or investigator.

ASSIGNMENT NO. 2
Appellant complains because the trial judge allowed the indictment to be amended after the trial had started.
Scott was initially charged by the Grand Jury with one count of first degree murder and two counts of attempted first degree murder. During a pretrial hearing on June 20, 1985, the prosecutor stated his intention to proceed with one count of second degree murder and two counts of attempted second degree murder.
At trial, on June 24, 1985, after the jurors had been sworn, the assistant district attorney formally amended the original indictment to conform to his earlier (on June 20th) announcement.
In State v. Williams, 347 So.2d 184 (La. 1977), the Supreme Court of Louisiana, at page 186, said:
"When an indictment is amended, unless a defendant moves for a continuance on the ground that he is prejudiced thereby and requires additional time to prepare his defense, he cannot later contend that he was prejudiced by the amendment. La.Code Crim.Pro. art. 489."
Scott not only failed to move for a delay, but he cannot show on appeal how or why he was prejudiced. He knew beforehand that he would be tried for lesser offenses. Before the indictment was formally amended, both the trial judge and defense counsel informed prospective jurors that Scott was charged with the reduced counts of second degree murder and attempted second degree murder.
This assignment of error is without substance.

ASSIGNMENT NO. 3
LSA-C.Cr.P. art. 382 reads, in pertinent part:
"A prosecution for an offense punishable by death, or for an offense punishable by life imprisonment, shall be instituted by indictment by a grand jury. Other criminal prosecutions in a district court shall be instituted by indictment or by information."
Thus, Scott argues, second degree murder, which is punishable by life imprisonment, must be instituted by the Grand Jury. The Grand Jury indicted Scott for first degree murder.
*400 This assignment of error has roots in this exchange that occurred during trial:
"BY MS. DUBROCA (Scott's attorney):
Your Honor, if I could suggest that we just note my objection and that we read second degree murder as opposed to first degree.
BY THE COURT:
All right. Then will you consent by stipulation that the State may supplement the record by filing an amended bill of information?
BY MS. DUBROCA:
Yes, sir.
BY THE COURT:
All right. And the mere thing, however, is this, this is an indictment with a grand jury name on it, foreman of the grand jury. Now, this is not what the grand jury found, Mr. Morgan.
BY MR. MORGAN (assistant district attorney):
I understand that, Your Honor.
BY THE COURT:
Now, I'm going to give you an opportunity if you want now to charge this individual by bill of information with second degree murder. You will have to have it typed up. Likewise, unless you can give the Court some authority that shows that you can amend this bill of indictment.
BY MR. MORGAN:
Your Honor, I know of no prohibition that's in the code.
BY THE COURT:
I'm not looking for prohibitions, I'm looking for authority.
DISCUSSION AT BENCH
BY THE COURT:
All right, State.
BY MR. MORGAN:
Your Honor, again we will move to amend the indictment that it will read one count of second degree murder of Eddie Collins, one count of attempted second degree murder on Alvin Collins, one count of attempted second degree murder on Robert Davis.
BY THE COURT:
All right.
BY MS. DUBROCA:
Your Honor, my objection still holds.
BY THE COURT:
All right. Your objection is noted. The Court will rule even though the code is not quite explicit that Louisiana jurisprudence does cover the matter and certainly the defense should not be heard or the defendant should not be heard to object to a bill of indictment being amended to a lesser offense since first degree murder in this case would have carried the possibility of a death sentence. Certainly, it's in the prerogative of the State to amend this indictment or prosecution to charge a defendant with second degree murder. Accordingly, the indictment is hereby ordered amended to provide that Jewel Scott is charged with committing second degree murder of Eddie Collins, and two counts of attempted second degree murder, one against Alvin Collins and one against Robert Lee Davis. The clerk will be instructed to read second degree murder each place that first degree murder appears on this indictment. Likewise, the State will be given until tomorrow to supplement the prosecution by a written bill of information charging the offenses that you are prosecuting. Do we understand where we are, gentlemen?
BY MR. MORGAN:
Yes, sir.
BY THE COURT:
Let's go ahead and amend it. Let's see that's 14:30.1?
BY MS. DUBROCA:
Yes, sir.
BY THE COURT:
All right. The Court will put 14:30.1. Scratch out the first and write in second, and I will initial it. All right, Mr. Morgan, the Court will ask the district attorney to come and initial the changes. All right, defense counsel, I will ask that you initial this, also. All right. At this time, the clerk will arraign the defendant on the amended charges. Mr. Scott, come up to the microphone.

*401 BY THE CLERK OF COURT:
Is your name Jewel Scott?
BY THE DEFENDANT:
Yes, ma'm.
BY THE CLERK OF COURT:
THE DEFENDANT IS DULY ARRAIGNED ON ALL CHARGES AND PLED NOT GUILTY TO EACH CHARGE.
BY THE COURT:
All right, let the not guilty pleas be entered. State you are ordered to supplement the prosecution with a written bill of information by tomorrow morning..."
The trial judge did not substitute or exchange the amended indictment for a bill of information, but rather he supplemented the amended indictment with the bill of information. The unorthodox and court-ordered bill of information was redundant, but in no way prejudicial.
In any event, Scott's convictions were based on the legally amended indictment, not the bill of information.

ASSIGNMENT NO. 4
Scott filed a motion to suppress a statement he had given to police officers. By this assignment, appellant questions the trial judge's finding that the utterance was free and voluntary and therefore admissible as evidence.
The Motion to Suppress was heard on June 3, 1985. Detective Ron DiStefano testified that he interviewed Scott in St. Charles Parish on November 15, 1984, following his arrest in New Orleans. DiStefano read the Miranda[1] rights at the time of the booking. Additionally, a rights form was filled out, and then a taped statement was given.
Scott testified that no promises or threats were ever made. Additionally, no one physically abused him in any way. The detective testified that the statement was taped because they were aware that Scott could not read or write very well.
The other detective, Olga Furroux, was present during the interview. She verified the circumstances surrounding the statement as to its free and voluntary nature.
Appellant does not complain of his treatment by the St. Charles Parish authorities; rather, he said that after his arrest, certain New Orleans policemen told him that if he didn't admit to what he did, they would strike him.
On cross-examination, Scott said that after he admitted who he was, he was no longer threatened. He then admitted that the St. Charles Parish authorities were fair with him. He further testified that he was advised of his rights and that he understood them. According to Scott, St. Charles detectives did not threaten him or his family in any way.
The trial judge concluded that the statement given by Scott was freely and voluntarily given and that the prosecution had met the burden of proof required by State v. Bell, 395 So.2d 805 (La.1981), and other cases. The record supports these determinations.
Even if New Orleans police officers acted improperly, the confession several hours later was voluntary. This is substantiated by Scott's own testimony. In State v. Beck, 445 So.2d 470, 474 (La.App. 2nd Cir. 1984), writs denied at 446 So.2d 315, it was stated:
"When a defendant gives two statements and the first is inadmissible as being illegally obtained, the second statement may, nevertheless, be admissible if it is not obtained by exploitation of the initial illegality, but instead is shown by the State to be sufficiently an act of free will entirely purged of and independent of the primary taint."
See also State v. Young, 344 So.2d 983 (La.1977), and State v. Davis, 336 So.2d 805 (La.1976).

ASSIGNMENT NO. 5
Seven days after the shootings, two police officers went to Charity Hospital and *402 showed Alvin Collins, in bed because of his wounds, six photographs. Collins identified Scott, who now argues that his identification should be voided because (1) Scott's photograph had an inkspot on it and the number on the rear of the picture was upside down unlike the others, (2) Scott was the only person in the photographic lineup with a bush haircut and (3) the visit to Collins in the hospital was "irregular."
Photographic lineups are unfairly suggestive if there is something about one particular photograph that focuses a viewer's attention on it. See State v. Robinson, 386 So.2d 1374 (La.1980), where it was unsuccessfully urged that the lineup was suggestive because the defendant's photo was older than the others and had a yellow tint. See also State v. Tate, 454 So.2d 391 (La. App. 4th Cir.1984), and State v. O'Neal, 478 So.2d 1311 (La.App. 5th Cir.1985).
Neither the small inkspot on Scott's photograph nor the fact that the hair on his head is slightly longer than the hair on the other five makes the lineup suggestive. The photographs are of five bearded black males, shown from the front and side, and the inkspot and Scott's hair do not focus a viewer's attention on that particular photograph. There is sufficient resemblance to have reasonably tested Collins' memory of Scott's face. Care and time went into the selection of the photographs, detectives said.
The photographs were shown to Collins and Davis front side up. Neither victim saw the rear side until Scott had been identified. Only then was the photograph turned over for Davis to sign on November 8, 1983, and for Collins to sign on November 14, 1983.
The fact that Collins was in the hospital is of no moment. There is no indication that he was under the influence of any medication or that his gunshot wounds were so serious that he was not able to make a reliable identification.
The burden was on Scott to show suggestiveness or an impropriety in the identification. This he could not do. The fact is, both Collins and Davis knew Scott by name and were well acquainted with his facial features.
The trial court correctly denied Scott's motion to suppress.

ASSIGNMENT NO. 6
In this assignment, Scott contends that the jury instructions were faulty in two respects: (1) the definitions of attempted second degree murder and attempted manslaughter were erroneous and (2) the definition of a principal was wrong.
When defining attempted second degree murder, the trial judge read:
"Thus, in order to convict the defendant of attempted second degree murder, you must find that an attempt was made to kill Alvin Collins and Robert Lee Davis, (1) and that the defendant acted with a specific intent to kill or to inflict great bodily harm; or that an attempt was made to kill Alvin Collins and Robert Lee Davis, (2) whether defendant had an intent to kill or inflict great bodily harm, and that the attempted killing occurred while the defendant was engaged in the commission or attempted commission of armed robbery ..."
It was error to include "or to inflict great bodily harm" in part (1) of the foregoing, and it was error to put the felony murder doctrine in part (2). The gravamen of the crime of attempted murder, whether first or second degree, is the specific intent to kill and the commission of an overt act toward accomplishment of that goal. See State v. Jarman, 445 So.2d 1184 (La.1984), and State v. Huizar, 414 So.2d 741 (La.1982).
In State v. Butler, 322 So.2d 189 (La. 1975), the Supreme Court of Louisiana said, at page 192:
"... By the nature of the attempt definition a specific intent to commit the crime, which may be more demanding than the intent required for the completed offense, is an essential element of that offense."
*403 This principle is further articulated in State v. Guin, 444 So.2d 625 (La.App. 3rd Cir.1983), at page 635:
"There is no dispute that the words `or to inflict great bodily harm' is part of the second degree murder statute. The charge here is that of attempted second degree murder and deals with the specific intent as defined in the attempt statute. When the attempt statute is invoked and the charge is attempted second degree murder, it is required that the person have the specific intent to kill a human being. Having specific intent to inflict great bodily harm and then only inflicting great bodily harm cannot be construed as attempted second degree murder."
(Underlining provided.)
In the trial judge's definition of attempted manslaughter, he also erroneously inserted "or inflict great bodily harm." See State v. Turner, 440 So.2d 834 (La. App. 2nd Cir.1983), which held that a specific intent to kill is an essential element of attempted manslaughter.
All errors, however, are not so prejudicial as to necessitate reversal. The Supreme Court of Louisiana, in State v. Gibson, 391 So.2d 421 (La. 1980), adopted the federal harmless rule as proclaimed in Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), that is, before an error can be held harmless, the court must be able to declare a belief that the mistake was harmless beyond a reasonable doubt.
Here, Scott was convicted of second degree murder of Eddie Collins. Despite the inadvertencies in the jury charge and the inclusion of improper bonding, we cannot conceive of the jury believing that Scott had the specific intent to kill Eddie Collins but only the intent to inflict great bodily harm on the other two, Alvin Collins, who was shot in the shoulder and thumb, and Davis. Otherwise stated, there is no reasonable probability that the inclusion of the erroneous language in the attempt definitions contributed to Scott's two lesser convictions. Therefore, although the trial judge erred, the errors were harmless. If Scott had been charged only with attempted second degree murder or attempted manslaughter and had not simultaneously been charged with and convicted of second degree murder, the logic of State v. Butler, supra, and State v. Guin, supra, would apply, resulting in reversal.
Concerning principals, the trial judge correctly told the jury that all persons involved in the commission of a crime are principals and are guilty of the offense charged. Scott argues that the charge should also have said that all principals are not automatically guilty of the same grade of the offense. Such wording is not necessitated by statute. A principal is defined in LSA-R.S. 14:24, and the trial judge read the precise definition.

ASSIGNMENT NO. 7
The following jury charges were requested by Scott but they were refused by the trial judge:
"Not all principals are automatically guilty of the same grade of an offense. In order to convict a defendant of a second degree murder which is accomplished when defendant B fired a shot at the victim, the State must prove specific intent on the part of the defendant A to kill the victim in order to convict defendant A of second degree murder."
"A specific intent to kill is an essential element of the crime of attempted second degree murder. Likewise, a specific intent to kill is an essential element of attempted manslaughter. If you do not find that Jewel Scott had the specific intent to kill Alvin Collins and Robert Lee Davis, then you must find him not guilty of attempted second degree murder and not guilty of the responsive verdict of attempted manslaughter."
"Testimony of an alleged accomplice should be treated with great caution. In order for you to convict Jewel Scott based on testimony of an accomplice, the testimony of the accomplice must be materially *404 supported by other evidence which connects Jewel Scott to the crime."
"Corroboration of an alleged accomplice's testimony must extend to every material fact necessary to establish the crime. This supporting testimony must come from a believable and unimpeached source."
Guidelines for special charges are provided by LSA-C.Cr.P. art. 807:
"The state and the defendant shall have the right before argument to submit to the court special written charges for the jury. Such charges may be received by the court in its discretion after argument has begun. The party submitting the charges shall furnish a copy of the charges to the other party when the charges are submitted to the court."
"A requested special charge shall be given by the court if it does not require qualification, limitation, or explanation, and if it is wholly correct and pertinent. It need not be given if it is included in the general charge or in another special charge to be given."
Scott's first requested special charge would have required qualification and/or an explanation and, as stated, was not entirely correct or necessarily pertinent. It was within the trial court's discretion to refuse this charge.
Requested charge (2) is accurate and should have been read. We have previously discussed the misstatements in the attempted second degree murder and attempted second degree manslaughter charges, however, and found these errors harmless as Scott was convicted of second degree murder and in the jury's opinion, had the specific intent to kill Eddie Collins.
Requested charges (3) and (4) relate to testimony of alleged accomplices. These "accomplices", however, were the persons being shot or shot at, Alvin Collins and Davis. While they were potential accomplices in a proposed drug transaction, they were not accomplices in the crimes Scott was charged with committing. The final two requested charges, accordingly, were totally inapplicable, and the trial judge so found.

ASSIGNMENT NO. 8
While Davis was on the witness stand, he was asked: "You've indicated that you've known Jewel Scott for a number of years?" His answer:
"Yes, a few years. But, like I say, not really knowing him, but knowing him from being a drug dealer."
Scott's attorney objected and moved for a mistrial, which was denied. The remark by Davis was unresponsive and spontaneous and was not made by the judge, the prosecutor or any court official.
The trial judge did admonish the jury to disregard Davis' comment in line with LSA-C.Cr.P. art. 771. Nonetheless, Scott feels that being called a "drug dealer" deprived him of a fair trial.
The trial judge's reasons for not declaring a mistrial are contained in the following colloquy:
"BY THE COURT:
All right. Remove the witness
WITNESS IS REMOVED FROM COURTROOM
BY THE COURT:
Note your objection, Counselor.
BY MR. ST. PIERRE:
Your Honor, I don't have any objections. I move for a mistrial, Your Honor. This witness has just made a conclusion, and he's just characterized my defendant, my client, as a drug dealer. It's prejudicial. I think we're entitled to a mistrial, and we so move. We have talked about this out of the presence of the jury yesterday. I asked Mr. Morgan to instruct his witnesses not to make those types of conclusions, and here he is, he has. Under article 770 in the Code of Criminal Procedure, second paragraph, well introductory paragraph; `upon motion of the defendant, a mistrial shall be ordered when a remark or comment made within the hearing of the jury by the judge, district attorney, or court official during a trial or in argument *405 refers directly or indirectly to' And subparagraph two, `another crime committed or alleged to have been committed by the defendant as to which evidence is not admissible.' I think that this
BY THE COURT:
Just one minute. Article 770 refers to `remarks or comments made within the hearing of the jury by the judge, district attorney, or a court official', it has nothing to do with the witness.
BY MR. ST. PIERRE:
This was elicited by the district attorney, Your Honor. Therefore, I think it's imputable to the district attorney.
BY THE COURT:
I think
BY MR. MORGAN:
Your Honor,
BY THE COURT:
One moment. I'm prepared to rule on it. I cannot see how the district attorney was responsible for that answer, nor was it elicited. However, I think even though there has been no testimony of drugs yet, there certainly will be testimony of drugs coming from Mr. Davis, coming from other witnesses in this trial. While perhaps the statement was a little premature, the Court finds that it was not prejudicial to the defendant. Consequently, the motion for mistrial is denied.
BY MR. MORGAN:
Your Honor, I would request that the Court instruct the witness that he should not refer to Mr. Scott as a drug dealer at this time.
BY THE COURT:
All right. I will do that. I will likewise instruct the jury to disregard the statement pertaining to drugs by the witness at this time.
BY MR. ST. PIERRE:
Your Honor, I would ask that you admonish them to disregard it, and leave off at this time. Just disregard it completely. If it comes out subsequently, that's fine.
BY THE COURT:
All right. Bring him in. I will be surprised if it doesn't Mr. St. Pierre:
WITNESS IS RETURNED TO COURTROOM
BY THE COURT:
Mr. Davis, the Court is going to instruct you not to refer to Mr. Scott as a drug dealer at this time, unless further
BY THE WITNESS:
Yes, Your Honor."
In State v. Joseph, 437 So.2d 280 (La. 1983), the prosecuting attorney asked a witness: "How did you know that was the same person?" Answer: "Because he had robbed me on an earlier occasion..." It was held that an admonition was sufficient to insure a fair trial. See also State v. Michel, 422 So.2d 1115 (La.1982).
Defense counsel further contends that the characterization of Scott as a "drug dealer" had the additional effect of forcing him to take the stand to rebut evidence as to his character when his character was not at issue and should not have been put at issue by the district attorney. In the voir dire of the jury, defense counsel mentions drug deals, marijuana and dealing in pot to the prospective jurors, and prior to the unsolicited remark by Davis, defense counsel brought Scott's previous involvement with drugs to the attention of the jurors. While we cannot specifically determine exactly when Scott and his counsel decided it would be in appellant's best interest to take the stand, the remark made by Davis does not appear to have been that prejudicial. The jury was admonished to disregard the remark, it does not seem likely that the remark precipitated Scott's taking the stand.
This assignment of error lacks merit. A mistrial is a drastic remedy and such relief here was properly denied.

CONCLUSION
Although the trial judge erred in his instructions to the jury, Scott was not deprived of a fair trial. The testimony and *406 evidence fully support the guilty verdicts, and we affirm them.
AFFIRMED.
NOTES
[1] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).