787 So.2d 1083 (2001)
STATE of Louisiana
v.
James WOODS.
No. 2000 KA 2147.
Court of Appeal of Louisiana, First Circuit.
May 11, 2001.
*1085 Doug Moreau, District Attorney, Aaron D. Brooks, Creighton B. Abadie, Assistant *1086 District Attorneys, Baton Rouge, for Plaintiff, State of Louisiana.
J. Rodney Messina, Johnny Wellons, Baton Rouge, for Defendant, James Woods.
Before: GONZALES, PETTIGREW, SEXTON, JJ.[1]
FRED C. SEXTON, Judge.
The defendant, James Woods, was charged by bill of information with attempted second degree murder, a violation of LSA-R.S. 14:27 and 30.1, and possession with the intent to distribute cocaine, a violation of LSA-R.S. 40:967(A). The defendant pled not guilty and, after trial by jury, was found guilty as charged. He subsequently was sentenced to twelve years at hard labor without benefit of parole, probation, or suspension of sentence for his conviction of attempted second degree murder. For his conviction of possession with the intent to distribute cocaine, he was sentenced to eight years at hard labor with the first five years to be served without benefit of parole, probation, or suspension of sentence.[2] The sentences were ordered to be served concurrently. The defendant has appealed, urging five assignments of error.

FACTS
On July 15, 1997, Gregory Labranch, Reginald Williams, and Kenneth Brown traveled to Baton Rouge from LaPlace, Louisiana, to buy drugs. Upon arriving in Baton Rouge, they encountered a man called Slim, who told them that they could buy drugs at the defendant's home. Slim then took the men to the defendant's home. Labranch had approximately $850.00 with which he planned to buy drugs. Slim, Brown, and Williams went into the defendant's home where Brown observed crack cocaine packaged in a sandwich bag. After negotiating over the price of the cocaine, the defendant began to weigh the cocaine. A discussion ensued between the men about the fairness of weighing the cocaine while it was still inside the plastic bag. Labranch then entered the house and a fight broke out between the men. Brown hit the defendant on the head with a gun and he, Labranch, and Williams left the house and jumped into their vehicle. Slim, who was armed, stayed inside the house. Shots were fired from the house at the vehicle occupied by Brown, Williams, and Labranch. Bullets entered the vehicle and one of the bullets struck Labranch in the leg. Brown tried to fire his gun but it did not work. Brown, Williams, and Labranch attempted to leave the scene in their vehicle, but the vehicle stalled. The men exited the car and ran to a nearby dry cleaners from which police were called to the scene.
*1087 Police later took Brown and Williams to the scene of the shooting where, according to police testimony at trial, they identified the defendant as the shooter. Subsequently, 23.3 grams of cocaine inside a plastic bag were found in the Labranch's vehicle. According to Brown, there was no cocaine in Labranch's car before they went to the defendant's home to buy drugs. However, Brown was not sure how the cocaine ended up in Labranch's car.

PROCEDURE
We find reversible error raised by defendant's first and second assignments of error. The defendant also argues in his third, fourth, and fifth assignments of error that the evidence is insufficient. When issues are raised on appeal, both as to the sufficiency of the evidence and as to one or more trial errors, the reviewing court should first determine the sufficiency of the evidence. The reason for reviewing sufficiency first is that the accused is entitled to an acquittal under Hudson v. Louisiana, 450 U.S. 40, 101 S.Ct. 970, 67 L.Ed.2d 30 (1981), if a rational trier of fact, viewing the evidence in accordance with Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), in the light most favorable to the prosecution, could not reasonably conclude that all of the essential elements of the offense have been proved beyond a reasonable doubt. When the entirety of the evidence is insufficient to support the conviction, the accused must be discharged as to that crime, and any discussion by the court of the trial error issues as to that crime would be pure dicta since those issues are moot.
On the other hand, when the entirety of the evidence, both admissible and inadmissible, is sufficient to support the conviction, the accused is not entitled to an acquittal, and the reviewing court must then consider the assignments of trial error to determine whether the accused is entitled to a new trial. If the reviewing court determines there has been trial error (which was not harmless) in cases in which the entirety of the evidence was sufficient to support the conviction, then the accused must receive a new trial, but is not entitled to an acquittal even though the admissible evidence, considered alone, was insufficient. Lockhart v. Nelson, 488 U.S. 33, 109 S.Ct. 285, 102 L.Ed.2d 265 (1988); State v. Hearold, 603 So.2d 731, 734 (La. 1992).
Accordingly, we proceed first to determine whether the entirety of the evidence was sufficient to support the defendant's convictions for possession with the intent to distribute cocaine and attempted second degree murder.

SUFFICIENCY OF THE EVIDENCE

(Assignments of Error Numbers 3, 4, and 5)
In his third assignment of error, the defendant contends that the trial court erred in sustaining a guilty verdict based upon insufficient evidence. In his fourth assignment of error, the defendant contends that the trial court erred in denying the defense's Motion for a Verdict of Acquittal. In his fifth assignment of error, the defendant contends that the trial court erred in denying the defense's Motion for a New Trial. Each of these assignments of error questions the sufficiency of the evidence used to convict the defendant.
In his brief to this court, the defendant contends that with regard to his conviction of possession with the intent to distribute, there was no credible evidence presented that the defendant had drugs on his person or in his home. He claims that the only cocaine found was in the victim's car and he was not connected in any manner to *1088 that cocaine. The defendant also asserts that no drug paraphernalia was found in his home. With respect to his conviction for attempted second degree murder, the defendant contends that none of the witnesses to the crime positively identified him as the shooter.
The standard of review for the sufficiency of evidence to uphold a conviction is whether, viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could conclude that the state proved the essential elements of the crime and the defendant's identity beyond a reasonable doubt. LSA-C.Cr.P. art. 821; State v. King, 563 So.2d 449, 456 (La.App. 1st Cir.1990), writ denied, 567 So.2d 610 (La.1990); State v. Johnson, 461 So.2d 673, 674 (La.App. 1st Cir.1984). The Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), standard of review incorporated in Article 821 is an objective standard for testing the overall evidence, both direct and circumstantial, for reasonable doubt. When analyzing circumstantial evidence, LSA-R.S. 15:438 provides that the fact finder must be satisfied that the overall evidence excludes every reasonable hypothesis of innocence. State v. McLean, 525 So.2d 1251, 1255 (La.App. 1st Cir.1988), writ denied, 532 So.2d 130 (La.1988). Where the key issue raised by the defense is the defendant's identity as the perpetrator, the state is required to negate any reasonable probability of misidentification. State v. Richardson, 459 So.2d 31, 38 (La.App. 1st Cir. 1984).
The testimony of the victim alone is sufficient to prove the elements of the offense. The trier of fact may accept or reject, in whole or in part, the testimony of any witness. Moreover, when there is conflicting testimony about factual matters, the resolution of which depends upon a determination of the credibility of the witnesses, the matter is one of the weight of the evidence, not its sufficiency. State v. Johnson, 529 So.2d 466, 473 (La.App. 1st Cir.1988), writ denied, 536 So.2d 1233 (La.1989). This court will not assess the credibility of witnesses or reweigh the evidence to overturn a fact finder's determination of guilt. State v. Polkey, 529 So.2d 474, 476 (La.App. 1st Cir.1988), writ denied, 536 So.2d 1233 (La.1989).
In the instant case, Kenneth Brown testified that on July 15, 1997, he was with Greg Labranch and Reginald Williams in Labranch's Cadillac. They decided to drive to Baton Rouge so Labranch could buy drugs. According to Brown, Labranch had $850.00, which he was going to use to buy drugs. While driving around Baton Rouge, the three men encountered a man called Slim that Brown's "podnuh" knew. Slim got into the car with them, they talked, and he took them to the defendant's home. Slim told them that the defendant had drugs at his home. After arriving at the defendant's home, Slim went inside the defendant's house for ten to fifteen minutes. Slim then returned to the car and Brown and "another guy" went inside the house. Brown indicated that the other person was Williams. Brown admitted that he was carrying a .45 gun and Slim was armed with a .38. Labranch kept the money while the others went inside the house. According to Brown, the defendant and the defendant's younger brother were inside the house when he entered. Brown identified the defendant in court as being the person whose house they entered.
Brown also saw drugs inside the defendant's home. He described the drugs as being "little rocks" that were packaged in a sandwich bag. Brown stated that no one brought cocaine into the house; the cocaine was already there. According to Brown, there was some negotiation over *1089 the price of the drugs and someone told the defendant that they had $850.00. The defendant was measuring out $850.00 worth of cocaine on a digital scale, when there was a discussion about weighing the cocaine while it was still inside the plastic bag. Labranch subsequently entered the defendant's home. The men then argued about the cocaine and Brown hit the defendant on his head with his gun. He thought the clip may have fallen out of his gun. Brown, Labranch, and Williams then ran out of the defendant's home and got into Labranch's car. Slim stayed inside the defendant's house. Someone then fired shots at Labranch's vehicle using an "AK-type.... machine gun type weapon." Brown denied seeing the defendant or Slim fire the weapon. However, Brown later admitted that Slim could have fired the gun. According to Brown, bullets entered the Cadillac and one hit Labranch in the leg. The defendant admitted that after the other men left the house and shots were fired, he tried to shoot his gun, but it did not fire. Labranch started the car and moved it, but the car stalled. Labranch, Williams, and Brown exited the car and ran to a nearby dry cleaners.
Brown was aware that cocaine was found inside the Cadillac, but he did not know who put the cocaine there. However, he testified the drugs found in the Cadillac were from the defendant's home. According to Brown, he, Williams, and Labranch went to the defendant's house with the intent to buy drugs but the deal did not take place. Brown admitted to seeing five rocks of cocaine in the house. He was not sure how the drugs got into the car but he conceded that his "podnuh" might have grabbed them from the defendant's house. According to Brown, the defendant's younger brother left from the rear of the house after they arrived. Brown admitted that he had been convicted of illegal use of a weapon stemming from the instant incident. He claimed to have no other convictions except for possibly a drug conviction as a juvenile.
Greg Labranch testified that on July 15, 1997, he drove his Cadillac to Baton Rouge with Brown and Williams to buy drugs. He had about $850.00 with him, which he was going to use to buy drugs. While in Baton Rouge, they met a man named Slim who told them that he could help them buy drugs and took them to a house on McKinley Street. At one point in his testimony, Labranch claimed not to know the name of the person they met. Labranch was not sure who lived at the house and he claimed that he did not know the defendant or see him at the house. He claimed that he did not remember much because he was intoxicated. Upon arriving at the house on McKinley Street, Labranch waited in the car while the others went inside the house. According to Labranch, Brown was armed when he went inside the house, Williams was not, and he did not know if Slim was armed. Approximately thirty minutes after the others entered the house, Labranch went inside the house and saw everyone fighting. Labranch saw Slim pull a gun on Brown. After they ran out of the house, someone shot at them. Labranch did not know who was the shooter. Labranch was shot in the leg, but he did not know the caliber of the bullet as it was still in his leg. According to Labranch, he was in the car when he was shot. The bullet went through the driver's side door. He denied previously saying that the gun that shot him was an AK-47. After he was shot and the car stalled, he jumped out of the car and ran to a nearby dry cleaners. Labranch agreed that Slim was armed with a .38.
Labranch reiterated that he did not know who shot him. He claimed that Slim told him that he lived at the house on McKinley Street. He claimed that he did *1090 not have any money, and that the money belonged to Brown. Labranch denied seeing the defendant before and indicated that the defendant never did anything to him. Labranch denied seeing any cocaine inside the house or picking up any cocaine from the house. He did not know who took the cocaine from the house. According to Labranch, there was not any cocaine inside his car before he went to the house on McKinley Street and he did not know if there was any cocaine inside his car after they left the house. Labranch claimed that Brown had the money to buy the cocaine with him. Labranch pled guilty to illegal use of a weapon in connection with the events of July 15, 1997.
Pete Bahlinger, Jr., testified that on July 15, 1997, at about 4:00 p.m., he was driving down McKinley Street when he saw a Cadillac stopped in the middle of the street. As Bahlinger approached the Cadillac, he stopped. He saw a person to his left and heard gunfire and some "shells" hit the street. At that point, three individuals ran out of a house and jumped into the Cadillac and the Cadillac moved. The shooter appeared to go inside the house, but after Bahlinger passed, he looked into his rearview mirror and observed the shooter "in the middle of the street doing this again." Bahlinger was not sure if he was firing again because he was too far away. Bahlinger decided that he needed to get out of the area because he was in the line of fire. He passed by the Cadillac, which was stopped with the driver's door open. Bahlinger saw three holes in the Cadillac. He then proceeded to the police station. According to Bahlinger, the shooter was firing a weapon that was on an AK-47 frame. In court, Bahlinger identified the person doing the shooting. He stated that he remembered his gait when he saw him walk through the hallway of the courthouse. When asked if he saw the person who fired the AK-47 type weapon in the courtroom, Bahlinger responded, "Yes, sir. I believe it's that fellow right over there by the defendant." On cross-examination, defense counsel asked Bahlinger if he saw "this man" fire any gun at anyone. Bahlinger responded that he saw him fire three or four rounds at the Cadillac and he heard the shell casings hit the ground near his truck. Bahlinger did not know if the man hit any of the men at whom he was shooting. Bahlinger admitted he had no knowledge about someone named Slim at that house being in possession of a .38. On redirect examination, Bahlinger indicated that the only person he saw shooting was the defendant. He did not hear the shooter say anything.
Detective Dave Mays was the first detective to arrive at the crime scene. Mays spoke with the defendant who told him that three black males went to his house and asked for a drink of water. After giving them some water, one of the men produced a weapon and told him to "give it up." A struggle ensued and the defendant was struck on the head with a gun. The men then fled and he went outside and attempted to fire some shots at them but his weapon jammed. According to Mays, the defendant had a laceration to his head and he was bloody. Mays identified the defendant in court as being the person he spoke to at the crime scene.
Sergeant Bart Thompson responded to a call from the dry cleaners on the date in question. Upon arriving at the cleaners, he spoke to Labranch, Brown, and Williams. Thompson observed that Brown had a laceration to his head, which was apparently caused by a bullet graze, and Labranch had been shot one time in the leg. Labranch was transported to the hospital and Thompson took Williams and Brown to the crime scene where Brown identified the defendant as being the person *1091 who shot them. According to Brown and Williams, the defendant used some sort of assault rifle. The defendant was taken into custody, the house was secured, and the car was seized.
According to Thompson, he was approached by witnesses at the scene who told him that just prior to the arrival of the police at the scene, a car left the residence in question. Thompson admitted that he did not see any cocaine at the defendant's residence. Thompson testified that he was made aware that cocaine was found in the victim's car. Statements were taken from Brown and Williams and they both told him that they went to the house in question to buy cocaine. Brown and Williams told him that the cocaine came from the defendant's house. Labranch refused to give a statement regarding the incident.
Sergeant Richard Cochran of the Baton Rouge Police Department testified that on July 15, 1997, he was working in the crime scene division and was summoned to the instant crime scene. He photographed the house and collected evidence. Cochran collected a live ".45 auto cartridge" from the porch near the front door and a spent Winchester 7.62 shell casing from the front yard. According to Cochran, the spent shell casing would have been fired by a rifle. From inside the house, Cochran collected a bloody gun clip that contained three live cartridges. Cochran admitted that he did not find any cocaine or drug paraphernalia inside the defendant's home. He did not find a .38 casing or a .38 bullet.
Sergeant Ron Cowart of the Baton Rouge Police Department testified that he helped secure the scene until the crime scene unit arrived. Cowart looked in the victim's car and found a bag of suspected cocaine in the driver's seat where the seat and the back of the seat meet. Labranch told Cowart that he went to the defendant's house to get a drink of water and "all hell broke loose."
Baton Rouge Police Lieutenant Edward McCants testified that he was summoned to the crime scene to take care of the victim's car. Upon looking in the car, he found a pistol with no magazine and a "baggy" of drugs. The weapon seized from the vehicle did not have a magazine in it, but it did have one bullet in the chamber. He did not find any spent casings.
The unanimous guilty verdict returned in this case indicates that, after considering the credibility of the witnesses and weighing the evidence, the jury accepted the testimony of the state's witnesses. This court will not assess the credibility of the witnesses or reweigh the evidence.
After reviewing the record, we are convinced that the evidence supports the jury's determination. Brown and Labranch testified that they went to the defendant's home to buy drugs. Brown saw cocaine inside the defendant's home, negotiated a price for the cocaine with the defendant, and observed the defendant measure the cocaine on a scale. After the instant incident, cocaine was found in Labranch's Cadillac and both Brown and Labranch indicated that there was no cocaine in Labranch's car before they went to the defendant's home. Neither Brown nor Labranch were sure how the cocaine ended up in Labranch's car; however, Brown did admit that the drugs found in the car were from the defendant's home and that his "podnuh" might have grabbed the drugs. Although cocaine was not found in the defendant's home, Sergeant Thompson testified that Brown and Williams told him that they went to the house in question to buy cocaine and that the cocaine in question came from the defendant's home. Cocaine was found in Labranch's car.
Although Labranch and Brown were unable to identify the defendant as *1092 the shooter in the instant incident, Brown admitted someone fired at them using an "AK-type" weapon and that Slim had been armed with a .38. According to Labranch, the bullet that hit him in the leg went through his car door. Bahlinger testified that he saw the shooter firing a weapon on an AK-47 type frame. Bahlinger identified the shooter in court, indicated that he remembered his gait when he walked through the courtroom, and indicated that the only person he saw shooting was the defendant. When asked to identify the shooter in court, Bahlinger stated he believed it was "that fellow right over there by the defendant." It is obvious from the lack of clarification by the prosecutor that Bahlinger indeed was indicating that the defendant was the shooter. In all likelihood, no one but the defendant and defense counsel would have been sitting together at the defense table as the defendant was the only person on trial. Additionally, Sergeant Thompson testified that Williams and Brown were returned to the crime scene where they identified the defendant as being the person who shot at them using some type of assault rifle. The defendant spoke to Detective Mays and placed himself at the scene of the crime.
A rational trier of fact, viewing all the evidence, both admissible and inadmissible, as favorable to the prosecution as any rational fact finder can, could have concluded that the state proved beyond a reasonable doubt the elements of possession with the intent to distribute cocaine and attempted second degree murder and the defendant's identity as perpetrator of that offense. These assignments of error are without merit.

OPENING STATEMENT

(Assignment of Error Number 1)
In his first assignment of error, the defendant contends that the trial court erred in ordering defense counsel to tell the jury during opening arguments about the defendant's prior arrests. In his brief to this court, the defendant argues that the judge, the prosecutor, and the court reporter were wrong about what was originally stated by defense counsel. He contends that forcing defense counsel to introduce evidence of his arrests, particularly without any type of Prieur hearing, was impermissible. The defendant claims forcing defense counsel to report this information to the jury was highly prejudicial as it was highly likely that the jury believed he had gotten away with crimes in the past and that he would not get away this time. He contends that he was deprived of his right to a fair trial, particularly since from the beginning of his trial, the jury was made aware that the instant arrest for possession with intent to distribute was the defendant's third drug related arrest.
Initially, we note that the state contends that because defense counsel failed to make a contemporaneous objection to the trial court's decision, he is barred from raising this issue on appeal. It is well settled in our law that an objection need not be raised by incantation. It is sufficient that a party, at the time the ruling or order of court is made or sought, makes known to the court the action that he desires the court to take, or his objections to the action of the court, and the grounds therefor. The contemporaneous objection rule has two purposes: 1) to put the trial judge on notice of the alleged irregularity so that he may cure the problem, and 2) to prevent a defendant from gambling for a favorable verdict and then resorting to appeal on errors that might easily have been corrected by objection. City of Baton Rouge v. Schmieder, 582 So.2d 1266, 1270 (La.1991). In the instant *1093 case, it is evident that defense counsel preserved this issue for appeal by making arguments to the court and prosecutor regarding the wording used in his opening statement. Thus, this issue is properly before this court.
Louisiana Code of Evidence Article 404(B)(1) provides:
Except as provided in Article 412, evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, of the nature of any such evidence it intends to introduce at trial for such purposes, or when it relates to conduct that constitutes an integral part of the act or transaction that is the subject of the present proceeding.
Louisiana Code of Evidence Article 609.1 provides, in pertinent part:
A. General criminal rule. In a criminal case, every witness by testifying subjects himself to examination relative to his criminal convictions, subject to limitations set forth below.
B. Convictions. Generally, only offenses for which the witness has been convicted are admissible upon the issue of his credibility, and no inquiry is permitted into matters for which there has only been an arrest, the issuance of an arrest warrant, an indictment, a prosecution, or an acquittal.
The general rule of Article 609.1 gives way when a witness has pending charges against him and the cross-examiner seeks to show the fact-finder that these pending charges may bias or influence the testimony of the witness. State v. Johnson, 32,910, p. 8 (La.App. 2d Cir.1/26/00), 750 So.2d 398, 405, writ denied, XXXX-XXXX (La.11/3/00), 773 So.2d 140.
During his opening statement, defense counsel stated:
Mr. Robert WoodsI talked to this young manhe was 14. He [was] over at his brother's house all the time. He said nobody has ever been over to buy any drugs from them. He [sic] never been arrested for no drugs, Mr. Robert Woods. Mr. Woods has never been convicted of anything. This man here, twenty something years old, he [has] never been convicted of anything.
At the conclusion of defense counsel's opening statement, the prosecutor asked to approach the bench and a side bar conference was held. The prosecutor complained that defense counsel stated that the defendant had never been arrested for drugs. Defense counsel argued that he said "convicted." The prosecutor countered that defense counsel used both terms and defense counsel denied doing so. The prosecutor and defense counsel continued to argue until the court stated that it was going to review the transcript. The court then asked the court reporter to review what was said by defense counsel. The court told defense counsel that if he said the defendant had never been arrested, then he would have to correct his statement. At this point, defense counsel stated, "I might have said that." Subsequently, the court stated that the court reporter checked the transcript and that defense counsel did state that the defendant had never been arrested or convicted. The court told defense counsel that he needed to correct his statement because he was incorrect for saying that the defendant had never been arrested. Defense counsel then inquired as to what he was to tell the *1094 jury and the court indicated that he was to tell the jury that defendant had been arrested on drug charges.
Defense counsel then addressed the jury and stated:
Ladies and Gentlemen of the jury, I want to always stay straight forward, and I talked to Mr. Brooks [the prosecutor] and when we talkedI talk fast sometimes and my mind go [sic] forward sometimes. Mr.Mr. Woods has been my client for a while, and I made a statement that Mr. Woods has never been arrested for a drug charge nor convicted. And I want to restate this to the jury. In my opening statement that Mr. Woods has been arrested once. I don't knowon a drug chargehe has been arrested on a drug charge, but that charge he was never convicted for that charge. Okay? Therefore
Shortly thereafter, the court asked to speak to defense counsel. A bench conference was held wherein the court and the prosecutor pointed out to defense counsel that the defendant had been arrested two times and defense counsel said he was arrested only once. The prosecutor asked defense counsel to correct the mistake. Defense counsel then told the jury:
Ladies and Gentlemen, I'm going to come back here and we are going to definitely go forward with the trial now. Mr. Brooks has a record on Mr. Woods. Mr. Woods has been arrested in '92 and '96, but he never [sic] been convicted for anything. He has a right to carry a gun. He has a right to vote, and that is why you come to court to prove or disprove or vindicatetherefore, he's just like us as citizens with all legal rights. Do I make myself clear? So any of us can get arrested, and I think some folks on the jury were arrested but until you are convicted of something okay. Now I am going to sit down before I mess up something.
In the instant case, the trial court erred in ordering defense counsel to inform the jury of the defendant's prior arrests. Defense counsel did not open the door regarding the defendant's arrests as he stated that it was the defendant's brother, Robert Woods, who had never been arrested and the defendant, James Woods, who had not been convicted. The court relied on the court reporter's erroneous review of the transcript. Additionally, the information regarding the defendant's previous arrests was not presented to the jury to show the defendant's motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, nor was it an integral part of the present proceeding. Furthermore, the exception to the rule set forth in LSA-C.E. art. 609.1, which states that only convictions are admissible, did not apply herein as there was no evidence presented that these charges were pending charges against the defendant and the issue of these arrests was not raised on cross-examination of the defendant to show bias or influence. This information was wrongly given to the jury only because of a mistake and not for any specific purpose.
Moreover, we are unable to find this error to be harmless. The erroneous admission of other-crimes evidence is a trial error subject to harmless-error analysis on appeal. State v. Johnson, 94-1379, p. 15 (La.11/27/95), 664 So.2d 94, 101. The test for determining whether an error is harmless is whether the verdict actually rendered in this case "was surely unattributable to the error." Sullivan v. Louisiana, 508 U.S. 275, 279, 113 S.Ct. 2078, 2081, 124 L.Ed.2d 182 (1993); State v. Morris, 99-3075, pp. 6-7 (La.App. 1st Cir.11/3/00), 770 So.2d 908, 915.
*1095 Evidence of other crimes is generally inadmissible in the guilt phase of a criminal trial unless the probative value of the evidence outweighs its prejudicial effect and unless other safeguards are met. This general rule ensures that a defendant who has committed other crimes will not be convicted of a present offense simply because he is perceived as a "bad person," irrespective of the evidence of his guilt or innocence. A conviction should be based on guilt and not on character. State v. Johnson, 94-1379 at p. 10, 664 So.2d at 99.
In arguing for a harmless error application in this case, the state points out the strength of its case and that the defendant failed to prove that he suffered any prejudice. While the state may have proved the elements of the charged crimes, we cannot say that the evidence of the defendant's guilt was overwhelming. The state's case depended on credibility determinations. No drugs were found on the defendant or in the defendant's house and only one witness saw drugs inside the defendant's home and saw the defendant weigh the drugs. Additionally, only one witness identified the defendant in court as being the shooter and his identification was confusing. The prejudice to the defendant's credibility created by this erroneous indication of two previous arrests on drug-related crimes cannot be measured. It certainly cannot be ruled out that the jury decided that he was a bad man who had been arrested for other drug offenses. Finally, we note that the defendant did not testify, but had he testified, it is unlikely that the state could have used these arrests to impeach him.
Considering all of the circumstances, we cannot conclude that the guilty verdicts actually rendered in this trial were surely unattributable to this error. Accordingly, we find that a harmless error analysis leads us to conclude the error was not harmless beyond a reasonable doubt and, therefore, these convictions must be reversed and the case remanded to the trial court for a new trial. This assignment of error has merit.

JURY INSTRUCTIONS

(Assignment of Error Number 2)
In his second assignment of error, the defendant contends that the trial court erred in including the element of specific intent to commit great bodily harm in the definition of attempted second degree murder in its instructions given to the jury. In his brief to this court, the defendant argues that the court's instructions were not harmless error as there was insufficient evidence to show that the defendant had a gun or even shot at the victim.
While a conviction for second degree murder can be obtained by showing that the defendant had either the specific intent to kill or the specific intent to inflict great bodily harm, a conviction for attempted second degree murder can be obtained only by showing that the defendant had the specific intent to kill and committed an act tending to accomplish that purpose. Intent to inflict great bodily harm will not support a conviction of attempted second degree murder. State v. Hongo, 96-2060, p. 2 (La.12/02/97), 706 So.2d 419, 420; State v. Butler, 322 So.2d 189, 192-93 (La. 1975).
In the instant case, the trial court, when instructing the jury as to the elements of the crime, simply read from the definition of second degree murder, LSA-R.S. 14:30.1(A)(1), followed by a definition of specific intent and attempt. The court then stated that in order to find the defendant guilty of attempted second degree murder, the jury must find that the defendant had the specific intent to commit the crime of second degree murder and did an act for the purpose of and tending directly *1096 toward the commission of the crime of second degree murder. Consequently, the court included the intent to inflict great bodily harm in the definition of second degree murder. Thus, the court issued erroneous instructions to the jury by including the "intent to inflict great bodily harm" element along with the proper and required "intent to kill" element.
Prior to the supreme court's opinion in State v. Hongo, there was a conflict among the courts of appeal, with some circuits holding State v. Butler mandated reversal and remand for retrial where the trial court erroneously instructed the jury that "intent to inflict great bodily harm" was an element of attempted murder. State v. Pyke, 93-1506, p. 8 (La.App. 3rd Cir.5/4/94), 640 So.2d 460, 465; State v. Holmes, 620 So.2d 436, 437 (La.App. 3rd Cir.1993), writ denied, 626 So.2d 1166 (La. 1993); State v. Guin, 444 So.2d 625, 635 (La.App. 3rd Cir.1983).[3] Other circuits applied a harmless error test, upholding verdicts where there was overwhelming evidence to support the conviction and the erroneous instruction was not found prejudicial. State v. Brunet, 95-0340, p. 7 (La. App. 1st Cir.4/30/96), 674 So.2d 344, 348, writ denied, 96-1406 (La.11/1/96), 681 So.2d 1258; State v. Harris, 26,269, p. 9 (La.App. 2d Cir.9/21/94), 643 So.2d 779, 784, writ denied, 94-2607 (La.2/17/95), 650 So.2d 251; State v. Lyles, 483 So.2d 1174, 1177 (La.App. 4th Cir.1986), writ denied, 488 So.2d 198 (La.1986); State v. Snyder, 97-226, p. 8 (La.App. 5th Cir.9/30/97), 700 So.2d 1082, 1087; State v. Jynes, 94-745, p. 15 (La.App. 5th Cir.3/1/95), 652 So.2d 91, 98; State v. Scott, 490 So.2d 396, 403 (La.App. 5th Cir.1986).
The State v. Hongo decision settled the issue, in holding:
Because the erroneous instruction at issue may be an irrelevancy and because a reviewing court can make this determination, the error is not structural such as that in Sullivan, but rather a trial error which may or may not have prejudiced defendant and thus is subject to harmless error analysis, or in the case of an ineffective assistance claim, an analysis of whether defendant was prejudiced by the error. [Footnote omitted.]
State v. Hongo, 96-2060 at p. 5, 706 So.2d at 422. Thus, the erroneous jury instruction does not require an automatic remand, and an appellate court must apply a harmless error analysis.
However, according to the record before us, the defendant's trial counsel did not object to the erroneous instructions given by the trial court. Thus, the defendant ordinarily is precluded from raising such an alleged error for appellate review. LSA-C.Cr.P. arts. 801 and 841. Nevertheless, exceptions to this rule have been made in individual cases where there have been fundamentally erroneous misstatements of the essential elements of the charged offense. In such cases, the Louisiana Supreme Court has adopted the view that such fundamentally incorrect jury instructions so affect the fairness of the proceedings and the accuracy of the fact-finding process that due process of law requires reversal, even in the absence of compliance with legislative procedural mandates. See State v. Williamson, 389 So.2d 1328, 1331 (La.1980); State v. Johnson, 98-1407, p. 10 (La.App. 1st Cir.4/1/99), *1097 734 So.2d 800, 807, writ denied, 99-1386 (La.10/1/99), 748 So.2d 439.
Whether an appellate court can continue to make a State v. Williamson analysis and review such a matter on direct appeal is now in doubt, in light of the supreme court's statement in State v. Hongo:
Although this case is before us via post-conviction proceedings because of trial counsel's failure to object, we note that because we find that the instant error is not structural, it necessarily is not of such significance as to violate fundamental requirements of due process, See State v. Williamson, 389 So.2d 1328 (La.1980), and thus a defendant must make a contemporaneous objection in order to preserve the error for direct review. State v. Thomas, 427 So.2d 428, 435 (La.1982) (on rehearing) (limiting Williamson as it "should not be construed as authorizing appellate review of every alleged constitutional violation and erroneous jury instruction urged first on appeal without timely objection.")
State v. Hongo, 706 So.2d at 422, n. 3. Nevertheless, we find it unnecessary to resolve the issue in the case now before the court, having found reversible error on another basis. Consequently, we pretermit this assignment of error.
CONVICTIONS AND SENTENCES REVERSED; REMANDED FOR NEW TRIAL.
NOTES
[1] The Honorable Fred C. Sexton, Jr., Judge (retired), Second Circuit Court of Appeal, is serving as judge pro tempore by special appointment of the Louisiana Supreme Court.
[2] Under the authority of LSA-C.Cr.P. art. 920(2), this court routinely reviews appellate records for patent error. After reviewing the record, we have discovered a patent sentencing error. For his conviction of possession with the intent to distribute cocaine, the defendant was sentenced to eight years at hard labor with the first five years of the sentence to be served without benefit of parole, probation, or suspension of sentence. However, at the time the defendant committed the instant crime, LSA-R.S. 40:967(B) (prior to its amendment by 1997 La. Acts No. 1284, § 1) did not provide for the first five years of the defendant's sentence to be served without benefit of parole, probation, or suspension of sentence. Thus, the defendant's sentence on that conviction is considered illegal. However, because we have found merit in the defendant's appeal and are reversing his convictions and sentences on those grounds, it is not necessary to vacate the sentence on this particular conviction and remand to the trial court for resentencing on this error.
[3] Although the Third Circuit later adopted the harmless error approach to the issue, in State v. Taylor, 96-320, p. 15 (La.App. 3rd Cir.11/6/96), 683 So.2d 1309, 1318, writ denied, 96-2828 (La.6/20/97), 695 So.2d 1348, the court could not determine that the erroneous instruction had been harmless error, in that case, and remanded the matter for a new trial.